# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ISAIAH TAYLOR,

      Plaintiff,

      v.                          **Case No. 21-CV-600-SCD**

JUSTIN SCHWARZHUBER,
JASEN RYDZEWSKI, and
CITY OF MILWAUKEE,

      Defendants.

---

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

In December 2015, two white Milwaukee police officers stopped and frisked Isaiah Taylor, a teenage black boy, thinking they'd just nabbed a robber escaping with his loot. Not so: the "loot" he was carrying under his arm turned out to be a frozen turkey he was delivering to a neighbor for the upcoming Christmas holiday. After discovering the frozen bird, the officers continued to hold Taylor to see if he had any outstanding warrants; finding none, they released him. Taylor later sued the officers and the City of Milwaukee alleging claims of racial profiling, unreasonable seizure, and unreasonable search.

The defendants have moved for summary judgment on all Taylor's claims, insisting their conduct comported with the Constitution and, if it didn't, they'd be shielded by qualified immunity in any event. Because the officers largely acted within the scope of their immunity, I will grant the defendants' motion in most respects. However, I conclude that qualified immunity does not shield the officers' detention of Taylor after their initial interaction revealed that the bag he was carrying contained a turkey.

# BACKGROUND

December 21, 2015 was a cold, windy day. Milwaukee police officers Justin Schwarzhuber and Jasen Rydzewski, who are both white, were assigned to patrol the area of West Capitol Drive in Milwaukee from North 32nd Street to I-43 targeting armed robberies that were occurring in that area at a high rate by juveniles. ECF No. 25 ¶ 2. However, on the day of the stop, the officers had not been notified of any crime committed in the area that day, and they did not know the last time a robbery had occurred in that area or any other details of the prior robberies. ECF No. 27 ¶ 6; ECF No. 28 ¶ 2.

At about 7:06 p.m. (after dark), the officers observed a juvenile—later identified as Taylor—run across Capitol Drive holding what appeared to be a bag. ECF No. 25 ¶¶ 1, 3–4. At his deposition, Rydzewski indicated that Taylor didn't appear to be jogging, and he was "running faster than what you'd normally run across the street," especially considering there wasn't heavy traffic at the time. ECF No. 24-2 at 30:19–32:7. Taylor did not stop running after he crossed Capitol, and he continued running southbound on North 15th or 16th Street. ECF No. 24-2 at 30:2–33:13; ECF No. 25 ¶ 5; ECF No. 24-3.[1] The officers claim that Taylor increased his speed after he noticed them. ECF No. 25 ¶ 8. Taylor denies speeding up when he saw the officers' marked squad car, which did not have its lights or siren on at the time. ECF No. 27 ¶ 5; Exhibit C to ECF No. 24 (Rydzewski body-cam video—available in hard copy only) at 0:03:17–0:03:25; ECF No. 30-1 at 5:22. According to Taylor, he was running because it was cold outside. ECF No. 27 ¶¶ 4–5.

---

[1] Rydzewski testified that Taylor was running southbound on North 15th Street; however, the computer-generated report of the incident indicates that the police stopped Taylor on North 16th Street.

As Taylor passed the squad car, the officers turned on the squad's lights and siren, yelled "hey," and told Taylor to stop. ECF No. 27 ¶ 10. Taylor complied. ECF No. 27 ¶ 11. Rydzewski then conducted a pat-down search of Taylor's outer clothing. ECF No. 24-2 at 37:19–20, 38:12–14. Rydzewski claims that he approached Taylor, introduced himself, and asked if he could pat Taylor down for weapons and that Taylor said "Yes." ECF No. 24-2 at 37:11–20. Taylor says Rydzewski immediately patted him down without telling him why or asking if he could. ECF No. 29 ¶ 6. During the pat-down, Rydzewski asked Taylor if he was high and if he had drugs; Taylor said "No." ECF No. 29 ¶ 7. The pat-down search did not uncover a weapon. *See* ECF No. 24-2 at 40:11–14. Schwarzhuber then looked in the brown paper bag Taylor had been holding and saw that it contained a frozen turkey. ECF No. 29 ¶ 9; ECF No. 27 ¶¶ 4, 18; ECF No. 24-1 at 42:3–8.

The officers, however, did not let Taylor to go at that time. ECF No. 27 ¶ 20. Instead, Rydzewski placed Taylor in the back of the squad car. ECF No. 27 ¶ 21. Taylor was not handcuffed, and the squad's heat was on. ECF No. 25 ¶ 13. The body-cam video shows that initially Taylor sat sideways in the back seat facing the outside while the door was open. *See* Ex. C at 0:00:05. He was seated for roughly two minutes in that fashion while Rydzewski stood outside the car and asked him his name, address, and phone number. *Id.* at 0:00:05–0:01:58. According to Rydzewski, Taylor was "polite," did not "resist in any way," and was "perfectly cooperative." ECF No. 27 ¶ 24 (quoting ECF No. 24-2 at 44:5–13). He provided the requested information, asked if he was in trouble, and tried to explain that he was just running across the street to deliver a turkey. Ex. C at 0:00:30–0:01:51; ECF No. 30-1 at 2:2–4:4; ECF No. 27 ¶¶ 25, 29. The officers did not know Taylor or recognize him from any prior dealing. ECF No. 27 ¶ 14.

Rydzewski explained that he was going to "shut the door real quick," "come sit on the other side," and "run [Taylor's] name." Ex. C at 0:01:51–0:01:57; ECF No. 30-1 at 4:5–8. He then closed the rear door (after Taylor moved his legs inside) and asked Schwarzhuber what was in the bag. Ex. C at 0:01:57–0:01:59; ECF No. 30-1 at 4:10. Schwarzhuber replied, "Turkey, it was a turkey." Ex. C at 0:01:58–0:02:02; ECF No. 30-1 at 8:13–15; ECF No. 25 ¶ 17.

Rydzewski then sat down in the front of the squad car to use the computer. Ex. C at 0:02:04–0:02:15. As Rydzewski struggled correctly typing the proper spelling of Taylor's first name, ISAIAH, into their system, Taylor became emotional and started to tear up. *Id.* at 0:02:15–0:02:30; ECF No. 27 ¶ 29. Schwarzhuber, who remained outside the squad, sensed that Taylor was emotionally upset and told him, "It's okay, man. You're not in trouble. Just calm down. All right?" Ex. C. at 0:02:30–0:2:35; ECF No. 30-1 at 4:16–18. He then asked, "Where are you coming from?" Ex. C at 0:02:50–0:02:52; ECF No. 30-1 at 4:22–23. Taylor responded. "My house. I was just dropping off a turkey for a friend," and he pointed out the friend's house. Ex. C at 0:02:52–0:03:10; ECF No. 30-1 at 4:16–5:14.

The officers then explained for the first time why they stopped Taylor. They told Taylor that they stopped him because he was running and "it kind of looked like" he ran faster after he saw them. Ex. C at 0:03:13–0:04:05; ECF No. 30-1 at 5:15–6:17. Taylor denied running faster, tried to explain why he was running, and apologized to the officers. *Id.* Schwarzhuber also explained that "[u]sually what happens is somebody, like, runs across the street, you know, they run and then they'll stop and walk. But, like, the fact that you just kept running . . . it almost looked like you were running like you saw us and you kept running faster. That's what it kind of looked like." *Id.* He continued, "Just from our perspective. Doesn't mean

4

you're doing anything wrong. Like, that's why we stopped to check it out. Okay? Like I say, you're not in trouble." *Id.* "Big thing is too," he went on, "there's been a lot of robberies on Capitol. Okay? And that's why we're out here. And a lot of them have been juveniles. Okay?" *Id.*

Taylor was in the back seat about sixty more seconds while the officers' computer was checking Taylor's name. *See* Ex. C at 0:04:00–0:04:56. The officers then released Taylor after the records check came back negative—he didn't have an outstanding warrant, he was not missing or a runaway, and he had no tickets. ECF No 27 ¶¶ 30–31; ECF No. 24-1 at 73:20–24; ECF No. 24-2 at 58:12–13. All told, Taylor was in the squad car less than five minutes.[2]

Rydzewski claims he placed Taylor in the squad because it was cold outside, and he wanted to get Taylor's information to see if he had any outstanding warrants. ECF No. 24-2 at 40:15–41:9; ECF No. 27 ¶ 21. Rydzewski said at his deposition that, in addition to checking for warrants, keeping Taylor in the squad bought the officers a few minutes to "see if any new fresh robberies" were reported in the area. ECF No. 24-2 at 44:18–21. The officers also testified that they "had to check to make sure [Taylor] wasn't a missing or a runaway." ECF No. 24-1 at 44:18–19; ECF No. 24-2 at 68:5–25.

Because the officers released Taylor without an arrest or a ticket, they did not write any reports about the incident. ECF No. 24-2 at 76:9–25. The computer-aided dispatch report

---

[2] Rydzewski's body-cam video is the only video in the record. It doesn't show the stop or frisk but rather begins right before the officers placed Taylor in the back of the squad car. *See generally* Ex. C. Rydzewski and Schwarzhuber suggested at their depositions that the earlier recording may have been purged given that the incident occurred more than five years before Taylor filed this lawsuit. *See* ECF No. 24-2 at 18:8–20:20; ECF No. 24-1 at 52:24–53:6. However, the audio from Rydzewski's body cam picks up exactly thirty seconds into the recording, which I know from previous cases involving the Milwaukee police suggests that's when Rydzewski activated the recording. The officers may have violated the department's policy on body-worn cameras if they didn't record the first portion of the encounter. That issue aside, a recording of the earlier events likely would have helped resolve Taylor's claims or may have precluded this lawsuit altogether.

5

indicates merely that the officers stopped a black male for suspicious activity. ECF No. 24-3. The report suggests the stop lasted about twenty minutes.

In April 2021, Taylor sued Schwarzhuber, Rydzewski, and the City of Milwaukee in state court, alleging under 42 U.S.C. § 1983 that the officers violated his constitutional rights. *See* ECF No. 1-2 at 4–14. The defendants removed the matter to federal court, the clerk randomly assigned it to me, and all parties subsequently consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 1, 4, 9. On June 20, 2022, the defendants moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* ECF Nos. 22, 23. Taylor filed a response to the motion, ECF No. 26, and the defendants filed a reply, ECF No. 32.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

6

*Id.* (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, I must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255). "However, [my] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in [his] favor." *Fitzgerald*, 707 F.3d at 730 (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

## DISCUSSION

"Section 1983 of Title 42 authorizes a federal cause of action against any person who, acting under color of state law, deprives another of rights secured by federal law or the United States Constitution." *Wollin v. Gondert*, 192 F.3d 616, 621 (7th Cir. 1999). The defendants concede Schwarzhuber and Rydzewski were acting under color of state law at the time they stopped, frisked, and detained Taylor. *See* ECF No. 5 ¶¶ 4–5. However, the defendants maintain that the officers did not deprive Taylor of his constitutional rights and that, even if they did, qualified immunity shields the officers from liability.

"For civil damages claims under 42 U.S.C. § 1983 for violations of constitutional rights, the doctrine of qualified immunity 'shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Muhammad v. Pearson*, 900 F.3d 898, 903 (7th Cir.

7

2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* "To overcome a defendant's invocation of qualified immunity, a plaintiff must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Muhammad*, 900 F.3d at 903 (quoting *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017)). "If the answer to either question is no, the defendant official is entitled to qualified immunity." *Muhammad*, 900 F.3d at 904 (citing *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014)).

Taylor alleges that Schwarzhuber and Rydzewski violated his rights under the Fourth Amendment and the Fourteenth Amendment's Equal Protection Clause.

## I. Qualified Immunity Shields the Officers from Liability on Some, But Not All, of Taylor's Fourth Amendment Claims

Taylor claims Schwarzhuber and Rydzewski violated his Fourth Amendment rights to be free from unreasonable seizures and searches. The defendants do not dispute that the officers seized Taylor when they turned on the squad car's lights and sirens, they told Taylor to stop, and Taylor complied. Nevertheless, the defendants maintain that reasonable suspicion supported the officers' actions and, even if reasonable suspicion was lacking, qualified immunity shields the officers from liability.

### A. Taking the facts in the light most favorable to Taylor, a jury reasonably could conclude that the officers violated Taylor's Fourth Amendment rights

Taylor alleges three separate Fourth Amendment violations. First, according to Taylor, Schwarzhuber and Rydzewski lacked reasonable suspicion to stop him. Second, Taylor asserts that, even if reasonable suspicion supported the initial stop, the frisk was unlawful because the officers did not reasonably suspect that he posed a danger to them. Third, Taylor maintains

8

that the officers unreasonably exceeded the scope of the seizure when they held him to check for outstanding warrants.

### 1. The stop

The Fourth Amendment prohibits unreasonable searches and seizures. *See* U.S. Const. amend. IV. "However, a brief, investigatory stop that demands only a limited intrusion into an individual's privacy is permitted under the Constitution when it is based upon 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). In other words, "police may conduct an investigatory stop of an individual when the officer has reasonable suspicion that a crime may be afoot." *Green*, 868 F.3d at 633–34 (citing *Terry*, 392 U.S. at 21–21). "Reasonable suspicion is more than a hunch—when an officer initiates a *Terry* stop, he must be able to point to specific facts that suggest that a stopped individual has committed, was committing, or is about to commit an offense." *D.Z. v. Buell*, 796 F.3d 749, 754 (7th Cir. 2015) (citing *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008); *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006)).

"In evaluating whether an officer had the requisite reasonable suspicion to support a *Terry* stop, [reviewing courts] must look at 'the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect.'" *D.Z.*, 796 F.3d at 754 (quoting *Lawshea*, 461 F.3d at 859). "For this reason, certain behavior that may seem innocent under some circumstances, may amount to reasonable suspicion when viewed in the context at play at the time of the stop." *D.Z.*, 796 F.3d at 754 (citing *United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008)). "The standard is objective and asks, 'would the facts available to the officer at the moment of the seizure . . .

9

warrant a man of reasonable caution in the belief that the action taken was appropriate?'" *D.Z.*, 796 F.3d at 754 (quoting *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994)).

The defendants argue that they are entitled to summary judgment on Taylor's unlawful stop claim because Schwarzhuber and Rydzewski reasonably suspected that Taylor had committed or was about to commit a crime. The defendants offer three specific and articulable facts from which the officers reasonably could have inferred that criminal activity was afoot. First, the officers were patrolling the Capitol Drive area targeting armed robberies that were occurring at a high rate by juveniles. Second, the officers observed Taylor running across Capitol Drive at night carrying an unknown object. Third, according to the officers, Taylor continued running faster when he saw the police. The defendants maintain that, when viewed in the aggregate, those facts would suggest to a reasonable officer that Taylor had committed a robbery or theft and was running away with the stolen object in his possession.

The defendants fail to acknowledge that Taylor disputes their most damning fact— that he increased his speed after seeing the police. "[T]he Supreme Court has held that evasive behavior and flight are suggestive of wrongdoing and can be factors considered in a court's determination of whether an officer had reasonable suspicion to execute a *Terry* stop." *United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) (citing *Illinois v. Wardlow*, 528 U.S. 119, 125–26 (2006)). Although Schwarzhuber and Rydzewski indicated at their depositions that Taylor ran faster when he noticed them, Taylor has submitted an affidavit insisting that he did not speed up when he saw the police. I am therefore precluded from considering the alleged speed boost when evaluating whether the defendants are entitled to summary judgment on Taylor's unlawful stop claim. *See Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011) (explaining that

10

reviewing courts must ask "whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right").[3]

Under the facts as Taylor describes them, a reasonable jury could conclude that Schwarzhuber and Rydzewski lacked reasonable suspicion to stop Taylor. The officers contend that Taylor caught their attention because he was running unusually fast at night in a high-crime area carrying a suspicious object in his arms. However, the officers were not responding to any crime reported that day, and they have not provided *any* facts about the past robberies in the area (aside from that juveniles apparently were the most common perpetrators). The officers also have not described anything suspicious about the object itself or how Taylor was carrying it; they simply didn't know if it was a bag or a backpack or what was inside it.

Moreover, that Taylor was "booking it" across Capitol, to use Rydzewski's term, adds little to the officers' suspicions. The officers did not observe Taylor run away from a store, a person, or a vehicle. They did not observe Taylor cut through private property. They did not observe Taylor check behind him as he ran. And Taylor says he was running fast because, as everyone agrees, it was cold outside that day. The facts relied upon by the officers in this case "are too vague, too general, and too common to provide a specific and articulable basis" for concluding as a matter of law that the officers reasonably suspected Taylor had just committed a robbery. *See United States v. Weathers*, 150 F. Supp. 3d 1029, 1035–36 (E.D. Wis. 2015) (granting motion to suppress evidence recovered during *Terry* stop where police observed a

---

[3] It's questionable whether, even under the officers' version of events, Taylor's actions could be construed flight. Unlike in the cases cited by the defendants, Taylor was already running when he first noticed the police, and the officers did not describe any sudden changes in direction or movement away from the officers. Indeed, Rydzewski testified that, after seeing the police, Taylor continued running down the sidewalk and then ran across the street in front of their squad car. ECF No. 24-2 at 33:2–35:12, 85:2–4.

man walking on a sidewalk looking back and forth over his shoulder with his hands in his pockets and appearing to approach another man doing yardwork).[4] A jury could therefore find that the officers violated Taylor's Fourth Amendment rights when they stopped him without reasonable suspicion of wrongdoing.

### 2. The frisk

"In the course of an authorized investigatory stop, an officer may proceed to conduct a protective pat down when confronting facts and circumstances giving rise to a reasonable suspicion that the individual has a weapon and otherwise poses a danger." *United States v. Adair*, 925 F.3d 931, 937 (7th Cir. 2019) (citing *Terry*, 392 U.S. at 27). Because a reasonable jury could conclude that the officers lacked reasonable suspicion to stop Taylor, I must deny the defendants' motion to extent they argue the same facts also supported the frisk. *See Terry*, 392 U.S. at 29–30 (permitting pat-down searches only during *lawful* investigatory stops).

Taylor nevertheless argues that the officers lacked a reasonable basis to frisk him notwithstanding the propriety of the initial stop. "An officer performing a *Terry* stop may not automatically frisk the individual subject to the stop; the officer must have some articulable suspicion that the subject is 'armed and dangerous.'" *Green*, 868 F.3d at 635 (*Arizona v. Johnson*, 555 U.S. 323, 327 (2009)). However, "[s]ome crimes, by their 'very nature' . . . are 'so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime.'" *Mwangangi v. Nielsen*, 48 F.4th 816, 826 (7th Cir. 2022) (quoting *United States v. Barnett*, 505 F.3d 637, 640

---

[4] The defendants contend Schwarzhuber and Rydzewski would have been derelict in their duties not to investigate Taylor's behavior. However, they could have continued to observe Taylor to see where he was headed or simply asked him what he was doing. Those alternative approaches would not have implicated Taylor's Fourth Amendment rights. *See Jones*, 630 F.3d at 682–83 (distinguishing consensual encounters, which require no level of suspicion, from investigatory stops).

(7th Cir. 2007)). The officers here subjectively believed that Taylor may have been involved in a robbery or theft, crimes "normally and reasonably expected to involve a weapon." *Barnett*, 505 F.3d at 640 (citation omitted); *Mwangangi*, 48 F.4th at 826 (listing robbery, burglary, and car theft as crimes that often involve a weapon). A reasonable jury could conclude that subjective belief was objectively unreasonable. But if the stop in this case was constitutional, then so too was the frisk.

### 3.    The continued detention

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Hall v. City of Chicago*, 953 F.3d 945, 952 (7th Cir. 2020) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "A *Terry* stop may 'last no longer than is necessary to effectuate' its purpose.'" *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) (quoting *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015)). Put another way, "[a] person stopped on reasonable suspicion must be released as soon as the officers have assured themselves that no skullduggery is afoot." *Lopez*, 907 F.3d at 486 (quoting *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (en banc)). "There is no bright-line rule as to how long an investigative detention may last; instead [reviewing courts] look to whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions." *Rabin v. Flynn*, 725 F.3d 628, 633 (7th Cir. 2013) (quoting *United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006)).

A reasonable jury could find that Taylor's continued detention to check for warrants was unreasonable. In *Hall v. City of Chicago*, the Seventh Circuit held that a delay to perform a warrant check during "a proper *Terry* stop" is permissible "as long as that delay is reasonable." 953 F.3d at 953. The undisputed facts here show that Rydzewski frisked Taylor

13

before he asked any questions to confirm or dispel his alleged suspicion that Taylor had just committed a robbery. *See United States v. Howell*, 958 F.3d 589, 601 (7th Cir. 2020) ("What most concerns us is how Officer Kelly reacted. He did not respond by continuing to approach Howell or allowing more time for further questions—'Where do you live?', 'Do you know anything about a burglary here?', 'Were you trying to climb under this fence?' and the like— but instead by immediately commencing a pat down."). The officers then placed Taylor in the back of the squad car and asked for his information, which Taylor willingly provided. Again, Rydzewski did not ask Taylor any questions about where he was coming from, where he was headed, or what was in the bag, and Rydzewski interrupted Taylor when he tried to explain himself. A jury presented with that evidence could reasonably conclude that the officers were not diligently pursuing their investigation.

A reasonable jury could also find that the officers impermissibly extended the stop beyond the time necessary to complete their investigation. The Seventh Circuit's decision in *United States v. Lopez* is instructive on this issue. The officers in *Lopez* received a tip about drug activity occurring inside the garage of a specific Chicago home. *Lopez*, 907 F.3d at 476. While monitoring the area, the officers observed a van pull up to the garage and saw two men— Fausto Lopez (the homeowner) and his brother—get out carrying shopping bags. *Id.* They eventually stopped both men, frisked Lopez, and obtained permission to search the garage, including the paper shopping bags the men had just carried in. *Id.* at 477. Despite finding no drugs, guns, money, or related paraphernalia inside the bags or the garage, the officers kept the van and Lopez's keys and cellphone and asked for permission to search the home. Lopez consented, and inside the officers found cash, drugs, and a gun. Lopez was arrested, and he eventually pled guilty to drug and gun charges.

14

On appeal, the Seventh Circuit reversed the denial of Lopez's motion to suppress the evidence found inside his home. The court determined that the officers lacked reasonable suspicion for the initial stop and frisk because they did not verify the informant's tip and because they did not observe anything indicating a potentially dangerous drug transaction. *Id.* at 479–86. The court further determined that, "[e]ven if the initial stop had been justified, it lasted too long." *Id.* at 486. According to the court, the officers' "inadequate justification evaporated when [they] looked inside the paper bags in the garage" and found no evidence whatsoever. *Id.*

Assuming the initial stop had been justified, a reasonable jury could still conclude that the officers impermissibly seized Taylor after their suspicion had evaporated. Like in *Lopez*, the officers here continued to detain Taylor after they looked inside the object he had been carrying and found no evidence of criminal activity. After Schwarzhuber looked inside the bag and saw it contained only a frozen turkey, he asked Taylor what he was up to. Taylor, who had been audibly sobbing just seconds prior, explained that he had just left his house to deliver a turkey to his neighbor, and he pointed out the neighbor's house. Despite Taylor's story checking out and uncovering no other information to suggest he was involved in a crime—the undisputed facts show that Taylor was cooperative throughout the entire encounter, the frisk turned up empty, and Taylor did not do or say anything to sustain or arouse the officers' alleged suspicion—the officers continued to hold Taylor another two minutes until they typed his name into the system and received the results of the warrant check. Rydzewski testified at his deposition that he also wanted to see if any new fresh

robberies were reported.[5] A jury presented with that evidence could reasonably conclude that the officers should have released Taylor immediately after looking inside the bag.

*     *     *

In sum, the facts presented describe a violation of Taylor's Fourth Amendment rights to be free from being stopped, frisked, and detained absent reasonable suspicion—that is, for running across the street at night in an area with recent robberies holding a bag.

**B.    Qualified Immunity: Taylor has failed to demonstrate that the stop and the frisk violated clearly established law, but the continued detention likely *did* violate clearly established law**

The defendants argue that even if they violated Taylor's constitutional rights, they are entitled to qualified immunity because none of those rights were clearly established at the time. "The plaintiff bears the burden of demonstrating that a right was clearly established at the time the alleged violation occurred." *Green*, 868 F.3d at 633 (citing *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 359 (7th Cir. 2005)). "For a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Green*, 868 F.3d at 633 (quoting *Mullenix*, 136 S. Ct. at 308). "The right must be 'sufficiently clear that every reasonable official would understand that what he is doing violates that right.'" *Id.*

"The Supreme Court has instructed that 'clearly established law should not be defined at a high level of generality.'" *Green*, 868 F.3d at 633 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)). "While a case directly on point is not required, 'the clearly established law must be particularized to the facts of the case.'" *Green*, 868 F.3d at 633 (quoting

---

[5] The officers also indicated they had to make sure Taylor wasn't missing or a runaway. However, they have not presented *any* facts to support such a belief. Moreover, the officers' actions are somewhat inconsistent with their alleged concern—there is no evidence they continued to observe Taylor deliver the turkey or offered to take Taylor home, despite being only a few houses away.

16

*White*, 137 S. Ct. at 551). "[S]uch specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Green*, 868 F.3d at 633 (quoting *Mullenix*, 136 S. Ct. at 308). Although "[i]t is usually necessary to identify an instance in which 'an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment,' . . . in the 'rare obvious case' the violation may be sufficiently clear 'even though existing precedent does not address similar circumstances.'" *Torry v. City of Chicago*, 932 F.3d 579, 587 (7th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

### 1.    The stop and frisk

Taylor first argues that the right to be free from being unreasonably stopped and frisked was clearly established in December 2015. As support, he cites two Supreme Court cases: *Terry* and *Michigan v. Long*, 463 U.S. 1032 (1983). He also cites a couple out-of-circuit cases— *Martin v. Conner*, 882 F. Supp. 2d 820 (D. Md. 2012) and *Vasquez v. Maloney*, 990 F.3d 232 (2d Cir. 2021)—that have held the right not to be stopped and/or frisked without reasonable suspicion was clearly established in 2009 and 2015, respectively. The problem with all these cases is that they define the alleged right at too "high level of generality," which the Supreme Court has repeatedly admonished lower courts not to do. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (listing cases). Indeed, Taylor does not discuss the facts of any of these cases or attempt to explain how they apply to the particular facts and circumstances facing the officers here. *Vasquez* is particularly unhelpful because the officers in that case offered "*no* facts at all" to justify their hunch that criminal activity was afoot. 990 F.3d at 240. In contrast, the officers in this case have offered several facts to support their belief that Taylor had just committed a

crime. Although a jury reasonably could find that belief was objectively unreasonable, this is not a case where the officers had no specific or articulable facts whatsoever to justify a stop and frisk. It was a close call.

Taylor does discuss the facts of one stop-and-frisk case: *Dantzler v. City of Milwaukee*, No. 10-C-0675, 2012 WL 3778958, 2012 U.S. Dist. LEXIS 123471 (E.D. Wis. Aug. 30, 2012). The officer in *Dantzler* observed two men walking in the direction of a utility worker during the middle of the afternoon. 2012 U.S. Dist. LEXIS 123471, *7–8. As the officer approached, one of the men, Willie Dantzler, hurried across the street with his hands in his pockets. *Id.* at *8–10. The officer questioned Dantzler and then patted him down, believing that he and the other man were about to rob the utility worker. *Id.* at *8–12. The officer arrested Dantzler after he found an open bottle of vodka in Dantzler's pocket and issued Dantzler a municipal citation. *Id.* at *12–13. Dantzler eventually sued the officer in federal court alleging he was unlawfully stopped and frisked. *Id.* at *1. The district court denied the officer's motion for summary judgment, finding that a reasonable jury could conclude he lacked reasonable suspicion to stop and question Dantzler. *Id.* at *24–27. The court also denied the officer immunity because *Terry* stop-and-frisk law was clearly established at the time of the officer's actions. *Id.* at *34–35.

*Dantzler* cannot formulate the clearly established law in this case for several reasons. First, it's an unpublished district-court decision and therefore lacks any precedential value. Second, *Dantzler* is distinguishable factually. The officer there confronted a completely innocent situation—two men walking in the general direction of a utility worker during the middle of the day. There was no evidence that the neighborhood was a high-crime area or that utility workers had been robbed in that area previously. *Id.* at *26. In contrast, the officers

18

here observed an individual running across the street in an area plagued by robberies carrying a bag in his arms. Those circumstances, although they may not rise to the level of reasonable suspicion, are significantly more indicative of wrongdoing than the behavior observed in *Dantzler*. Finally, like the other cases cited by Taylor, the court in *Dantzler* did not define the violated right with the level of specificity required by the Supreme Court. *Dantzler* therefore is of no help to Taylor.

### 2. The continued detention

As set forth above, *Lopez*—Taylor's best case—makes clear that a jury could find that the officers should have released Taylor once they realized that the bag contained an innocuous turkey rather than contraband or loot from a robbery. Alternatively, a jury could conclude that, by not even asking about his actions and proceeding immediately to place him in the squad car and ask his name, the officers were not expeditiously attempting to tailor their inquiry to the reason they stopped Taylor in the first place. Although *Lopez* (2018) post-dates the 2015 detention at issue here, the court was hardly creating new law or addressing itself to a novel concept. Instead, it simply found that "the officers continued detaining Lopez beyond the original justification for the stop," *Lopez,* 907 F.3d at 476. For this conclusion, the court relied on the time-tested principle that "[a] *Terry* stop may 'last no longer than is necessary to effectuate' its purpose." *Id.* at 486 (quoting *Rodriguez*, 135 S. Ct. at 1614). In addition, the court cited a 2002 case for the principle that "[a] person stopped on reasonable suspicion must be released as soon as the officers have assured themselves that no skullduggery is afoot." *Lopez*, 907 F.3d at 486 (quoting *Childs,* 277 F.3d at 952). Finding that any suspicion that might have existed "evaporated when the officers looked inside the paper bags," the court found that the continued detention lasted too long. *Lopez*, 907 F.3d at 486. The same holds true here. The

19

officers, upon discovering that Taylor's bag contained a frozen turkey rather than contraband or loot from a robbery, should have been "assured . . . that no skullduggery [was] afoot" and released Taylor. *Id.* Instead, they held him to conduct a warrant check and to see if any new burglaries were radioed in. The law by 2015 was clearly established.

Apart from *Lopez,* I note that "in ascertaining whether a right is clearly established, the court is not limited to considering only precedent from the Supreme Court or this circuit." *Delaney v. DeTella,* 123 F. Supp. 2d 429, 439 (N.D. Ill. 2000), *aff'd,* 256 F.3d 679 (7th Cir. 2001). In *Spreen v. Brey,* for example, the Seventh Circuit noted that "the rulings in other circuits are instructive on what the law is as to constitutionally protected rights." 961 F.2d 109, 113 (7th Cir. 1992). One reason for this approach is to "preclude[] an official from escaping liability for unlawful conduct due to the fortuity that a court in a particular jurisdiction had not yet had the opportunity to address the issue." *Cleveland-Perdue v. Brutsche,* 881 F.2d 427, 431 (7th Cir. 1989).

Looking outside the circuit, then, I begin with *United States v. Fuller,* where the court conducted a thorough survey of the state of the law as it existed in 2015. 120 F. Supp. 3d 669, 678–82 (E.D. Mich. 2015). There, an officer reasonably stopped Fuller to determine whether he was Warlix, a suspect in an investigation. The court held, however, that once the officer was satisfied that the individual was *not* Warlix, he could not "further detain [the] suspect in order to obtain additional information through a warrant check or records review." *Id.* at 681–84.

For this conclusion, the court relied on a case from the Sixth Circuit, *United States v. Davis,* 430 F.3d 345 (6th Cir. 2005). There, Davis was stopped in his car on suspicion of transporting narcotics. *Id.* at 349–50. Police brought a drug-sniffing dog, which failed to alert

20

positively to the presence of drugs in the car. *Id.* at 350. Nevertheless, a DEA agent arrived on

the scene and ordered a second drug-sniffing dog from a neighboring county. That second dog

*did* alert to the rear of the car, at which point officers found more than $700,000 in cash and

other incriminating materials. The court found that the continued detention after the first dog

failed to alert was unreasonable, rendering the second dog alert improper. "Once the purpose

of the initial traffic stop is completed, an officer cannot further detain the vehicle or its

occupants unless something happened *during the stop* to cause the officer to have a 'reasonable

and articulable suspicion that criminal activity [is] afoot.'" *Id.* at 353 (citation omitted).

The *Fuller* court also cited *United States v. McSwain,* where the Tenth Circuit held that

a motorist cannot be detained once suspicion that he committed a traffic violation was

dispelled. 29 F.3d 558 (10th Cir. 1994). A trooper had stopped the vehicle upon seeing a

partially obstructed registration sticker. *Id.* at 559–60. However, once he approached the car,

he realized it was *not* obstructed at all. Nevertheless, the trooper detained the driver to conduct

questioning and a license check.

> Trooper Avery's reasonable suspicion regarding the validity of [the driver's]
> temporary registration sticker was completely dispelled *prior* to the time he
> questioned [the driver] and requested documentation. Having no objectively
> reasonable articulable suspicion that illegal activity had occurred or [was]
> occurring, Trooper Avery's actions in questioning [the driver] and requesting
> his license and registration exceeded the limits of a lawful investigative
> detention and violated the Fourth Amendment.

*Id.* at 561–62 (citations and internal quotation marks omitted).

The court reached a similar conclusion in *United States v. Edgerton,* where another

trooper mistakenly believed a vehicle's registration tag was obstructed. 438 F.3d 1043 (10th

Cir. 2006). Once he discerned that it was properly visible, he "should have explained to [the

driver] the reason for the initial stop and then allowed her to continue on her way without

21

requiring her to produce her license and registration." *Id.* at 1051 (citation omitted) "[O]nce the purpose of the stop is satisfied and any underlying reasonable suspicion dispelled, the driver's detention generally must end without undue delay." *Id.* at 1047 (citation omitted).

These cases are of a piece with *Lopez,* as they implement the uncontroversial principle established in *Terry* and re-echoed in *Lopez* that "[a] person stopped on reasonable suspicion must be released as soon as the officers have assured themselves that no skullduggery is afoot." *Lopez*, 907 F.3d at 486 (quoting *Childs*, 277 F.3d at 952). As the Supreme Court itself reiterated in 2015, "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez,* 575 U.S. at 354 (citing *Caballes*, 543 U.S. at 407). When the "mission" of the stop has been accomplished (for example, by dispelling any suspicion of criminal activity), the police cannot extend the stop. "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355. "The scope of the [*Terry*] search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Florida v. Royer,* 460 U.S. 491, 500 (1983) (citation and quotations omitted).

Notably, these same principles have also been applied in this circuit. In *United States v. Jones,* for example, the court found that "while the stop was arguably proper at its inception, once the purpose of the stop . . . was completed (the search of Jones' person and two vehicle searches proved fruitless), nothing occurred in the course of the stop to give the officers the reasonable suspicion needed to further the detention." No. 99 CR 387, 1999 WL 1068639, 1999 U.S. Dist. LEXIS 18245, at *36 (N.D. Ill. Nov. 18, 1999). And in *Cleveland v. Swanson,*

the district court had little trouble rejecting the qualified immunity defense when officers detained an individual for twenty minutes after they should have realized he was not the right suspect. "There is no question that the right to be free from unreasonably lengthy detention during an investigatory stop is clearly established." No. 12-CV-8283, 2013 WL 2421752, 2013 U.S. Dist. LEXIS 77287, at *16 (N.D. Ill. June 3, 2013) (citing *Caballes*, 543 U.S. at 407; *Royer*, 460 U.S. at 500; *Terry*, 392 U.S. at 18–19; *Childs*, 277 F.3d at 952).

In sum, in 2015 it was hardly a novel concept that detentions must be tailored to the suspected offense and, more particularly, that officers should release a suspect once they know "no skullduggery is afoot." *Childs*, 277 F.3d at 952. Here, assuming the initial suspicion involved a possible robbery, that suspicion would have mostly or completely dissipated once Schwarzhuber realized the bag contained a turkey. Instead of asking Taylor about what he was doing with a turkey, the officers proceeded immediately to a pat-down search and placed him in the squad car, where they ran his name for warrants and waited to see if any new robberies had been reported. Even after Schwarzhuber told Rydzewski that the bag contained a turkey, the questioning and warrant check continued. And when Taylor finally volunteered that he was delivering a Christmas turkey to a neighbor just a few doors down, he remained in the squad car pending the warrant check. Because the law was clearly established in December 2015 that the police may not continue to hold an individual to conduct a warrant check after the suspicion justifying the stop has dissipated, I cannot find that qualified immunity shields the defendants' continued detention of Taylor.

## II.  Qualified Immunity Shields the Officers from Liability on Taylor's Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment "prohibits selective enforcement of the law based on considerations such as race." *Wren v. United States*, 517 U.S.

23

806, 813 (1996). "To show a violation of the Equal Protection Clause, [a] plaintiff[] must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001) (citations omitted). The plaintiff, however, need not prove that "the challenged action rested solely on racially discriminatory purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Rather, the plaintiff must show that race was "a motivating factor in the decision." *Id.* at 265–66. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. For class-of-one equal protection claims, the plaintiff must show that the defendants "intentionally treated him differently from similarly situated individuals without a rational basis." *Ford v. Sessoms*, 727 F. App'x 875, 877 (7th Cir. 2018) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012)).

Taylor maintains that the officers discriminated against him on the basis of his race when they stopped him, frisked him, and detained him while checking for warrants. He does not offer any direct evidence of racial discrimination, name any similarly situated white individuals who were stopped, frisked, and detained in similar circumstances, or present any statistics to show the officers' actions in this case were motivated by his race. Rather, he contends the officers' invidious discriminatory purpose can be inferred from the totality of relevant facts. Taylor notes that Schwarzhuber and Rydzewski both are white and that he is black, a fact the officers indisputably knew at the time of the stop—they reported to dispatch they'd stopped a black male for suspicious activity. Taylor also asserts that the officers have not articulated the basis for finding him suspicious, aside from the fact that he was a black

male running. Finally, Taylor points out that the officers asked if he was high and had drugs despite having no reason to suspect he was engaged in any drug activity.

Even when viewed in the light most favorable to Taylor, the party asserting the injury, the facts do not show that Schwarzhuber and Rydzewski treated Taylor differently because of his race. First, the difference in race between Taylor and the officers is too general to raise an inference of racial discrimination. *See, e.g.*, *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003) ("Essentially, Bingham argues that because he is African-American, the officer is white, and they disagree about the reasonableness of the traffic stop, these circumstances are sufficient to raise an inference of racial discrimination. We disagree that this is sufficient to state an equal protection claim.").

Second, Taylor has not presented any evidence to suggest that the officers' report to dispatch suggests they were racially motivated. That report does not indicate that the officers stopped Taylor *because* he was black. Nor has Taylor shown that his race was an unnecessary detail to include in the report to dispatch. *Cf. Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1170 (10th Cir. 2003) (reversing summary judgment in favor of police officer on equal protection claim in part because the officer noted a racial designation on the citation form where none was called for).

Third, although an officer's lack of reasonable suspicion may be relevant to whether he acted with rationally discriminatory intent, "a lack of reasonable suspicion alone is insufficient to show such intent." *See Bey v. Falk*, 946 F.3d 304, 320 (6th Cir. 2019) (collecting cases). The officers in this case did articulate at least some basis, aside from race, that aroused their suspicions—while on robbery patrol, they observed a young individual running quickly

across a street holding an unknown object, and the individual continued running after he made it across the street.

Fourth, Taylor has not explained how the officers' questions about drugs reflected they were acting on racial stereotypes. Unlike the officers in *Marshall*—the main case Taylor relies upon for his equal protection argument—the officers here asked about drugs generally; they did not accuse Taylor of having crack cocaine, a drug stereotypically associated with African Americans. *Cf. Marshall*, 345 F.3d at 1169 ("The first words out of Officer Porter's mouth when he confronted Mr. Marshall after the stop were a cryptic accusation that Mr. Marshall was on crack. ('Is a few rocks worth all that?')). Taylor has not alleged the officers engaged in any other racially derogatory comments or behavior during the encounter.

Finally, Taylor has not presented any evidence of prior, potentially racist misconduct by Schwarzhuber or Rydzewski. The Tenth Circuit remarked in *Marshall* that, without the misconduct evidence, it was "a close question" whether the other evidence—the plaintiff's denial he had committed a traffic violation, the officer's apparent attempt to ascertain the plaintiff's race *after* the alleged violation, the unsupported accusation about the plaintiff having crack rocks, the officer unnecessarily noting the plaintiff's race on the gender portion of the citation form, and the officer changing his story about what happened—was sufficient to require the officers to go to trial on the plaintiff's racial discrimination claim. *Marshall*, 345 F.3d at 1168–71. The evidence of discriminatory animus in this case is even less than the "other" evidence deemed close in *Marshall*.

Because Taylor has not demonstrated that Schwarzhuber and Rydzewski treated him differently because of his race, I don't need to determine whether the law was clearly

26

established at the time. The officers are entitled to qualified immunity from Taylor's equal protection claim.

## CONCLUSION

For all the foregoing reasons, the court **DENIES** the defendants' motion for summary judgment, ECF No. 22, with respect to the continued detention of Taylor. The court **GRANTS** the motion in all other respects.

**SO ORDERED** this 27th day of January, 2023.

_____
STEPHEN C. DRIES
United States Magistrate Judge